MEMORANDUM ORDER
 

 MARTEN, District Judge.
 

 This is a sex discrimination action brought against the Wichita Eagle, which has filed the current motion for summary judgment. The plaintiff Rita Timmermeyer alleges that the defendant discriminated against her in refusing to promote her. The court has reviewed the arguments and evidence submitted by the parties and concludes that the motion for summary judgment must be granted.
 

 Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party.
 
 McKenzie v. Mercy Hospital,
 
 854 F.2d 365, 367 (10th Cir.1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt.
 
 Ellis v. El Paso Natural Gas Co.,
 
 754 F.2d 884, 885 (10th Cir.1985). The moving party need not disprove plaintiff’s claim; it need only establish that the factual allegations have no legal significance.
 
 Dayton Hudson Corp. v. Macerich Real Estate Co.,
 
 812 F.2d 1319, 1323 (10th Cir. 1987).
 

 In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation.
 
 Anderson v. Liberty Lobby, Inc.,
 
 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. “In the language of the Rule, the nonmoving party must come forward with ‘specific facts showing that there is a
 
 genuine issue for trial.’ ” Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,
 
 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed. R.Civ.P. 56(e)) (emphasis in Matsushita). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose.
 
 Celotex Corp. v. Catrett,
 
 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
 

 Findings of Fact
 

 Rita Timmermeyer is a 35-year-old white female. She went to work for the defendant Wichita Eagle and Beacon Publishing Company on about March 20, 1991. She was initially a part-time temporary
 
 *1202
 
 assistant on the Nightside Composing Shift. According to Timmermeyer, she had excellent evaluations from both male and female supervisors at the Eagle from 1991 to 1998. In July of 1996, she was promoted to Assistant Interim Nightside Manager.
 

 At the end of 1997, Composing Room Manager Marcia Franklin and Trish Dev-lin reviewed Timmermeyer. The Performance Appraisal by Franklin of December 31, 1997 states that “[i]n the technology area Rita has come a long way in the past year,” but that she needs to “be willing to embrace this new knowledge” and overcome “a sense of trepidation in tackling problems that arise.” (Franklin Aff. Attachment).
 

 The Performance Appraisal by Devlin dated January 10, 1998, which Timmer-meyer acknowledged as “accurate” states that Timmermeyer “does excellent work, but sometimes gets in a hurry.” (McHa-ney Aff., Attachment). The Appraisal states Timmermeyer “is very self-motivated, but does not always have a very positive attitude”. Id. Overall, the report states, “Rita 90% exceeds expectations [and for] the other 10% need to work on attitude and keeping focused.” Id.
 

 On April 13, 1998, Franklin appointed Timmermeyer to the Acting Nightside Composing Room Manager when Devlin stepped down from that position. According to Timmermeyer, Devlin was forced to step down because of chronic absenteeism. Timmermeyer states that this problem existed for the previous nine months, and that she “had covered for [Devlin], assuming virtually all responsibilities of the Nightside Composing Room Manager.” (Timmermeyer Aff. at K 17). Franklin told Timmermeyer and Rene. Ornelas that she was choosing Timmermeyer for the position, because Timmermeyer had been covering for Devlin, and because Timmermeyer had more experience than Ornelas. Franklin also told Timmermeyer, according to Timmermeyer’s affidavit, that she should continue training Ornelas “since he had virtually little or no experience in the composing room operations.” (Id.) Tim-mermeyer states that Ornelas “made regular errors due to his inexperience and lack of training.” (Id.)
 

 Timmermeyer also states that Franklin spoke with her about becoming the permanent Nightside Composing Room Manager. She states that Franklin frequently told her she was doing an excellent job and was the primary candidate for that position. Franklin told Timmermeyer that posting the job was a mere formality: no one had Timmermeyer’s experience or expertise, and that Timmermeyer wouldn’t even need to fill out an application for the job. Franklin denies making such comments to Timmermeyer.
 

 The position of Nightside Composing Room Manager was not posted in April, May, June, or July of 1998. During this time, Franklin was being considered for a move to the job of Assistant Manager of Assembly and Distribution, which paid more than her current position. According to Franklin, she did not choose a Nightside Composing Room Manager during this time, since she believed it would be better for her successor in the Composing Department to make that decision.
 

 While Franklin did not choose a Night-side Composing Room Manager, she did (again, using Timmermeyer’s version of the facts) tell Timmermeyer that Timmer-meyer was the preferred candidate, complimented her for her independence, and never told her that she needed to work on her leadership or grasp of technology.
 

 Franklin transferred to Assembly and Distribution on July 10, 1998. The new Composing Room Manager was Milton Mounts. On August 28, Mounts spoke with Timmermeyer in his office, and the two spoke about the Nightside Composing Room Manager position. Mounts told Timmermeyer that the candidates had been narrowed down to Timmermeyer and Ornelas, and that he would make a decision in the next few weeks. According to
 
 *1203
 
 Timmermeyer, she asked Mounts if he would talk with Franklin about the promotion, but Mounts told her the decision was his alone. He also told her that he had not looked at her past performance evaluations. Timmermeyer told Mounts she had been effectively performing the job for the last fourteen months, but that he was unimpressed. Mounts said that Timmermeyer needed to prove herself to Mounts in the immediate future. Timmer-meyer reminded Franklin that the position still had not been posted. Mounts was unaware of this, and the job was posted on September 3,1998.
 

 After the posting, there were three candidates: Timmermeyer, Ornelas (a Hispanic male), and Celiamor Kindred (a Filipino female). Kindred had worked in the newspaper business since 1980, and was hired by the Eagle on October 27, 1992 as a part time Composing Room Assistant (CRA). Ornelas had been hired as a CRA on June 8, 1993. He had studied Composing at East High Vocational Technical school. He became Head Platemaker in 1997, and Assistant Night Manager in March of 1998. Kindred and Ornelas both became journeymen in October of 1997. Timmermeyer had 18 years of experience in the newspaper business. All three candidates had the same length of experience in the Eagle’s Composing Room.
 

 On September 7, Mounts called Timmer-meyer to tell her of Kindred’s application, and that he would decide the matter after September 11. On September 15, Mounts told Timmermeyer he would make a decision the next day, and, when Timmermeyer said that was her day off, told her that he would call her at home with his decision. ,
 

 At around 2:00 p.m. on September 16, Mounts called Timmermeyer, and told her that he had chosen Ornelas. Mounts told Timmermeyer that he did not like her “high metabolism” (Mounts later told Tim-mermeyer he felt she had a tendency to become stressed out about problems), and that she needed to improve her computer skills. (Timmermeyer Aff., at H 25). Tim-mermeyer states that she told Mounts she trained Ornelas on use of computer technology.
 

 Mounts has stated that Timmermeyer was very angry and upset in the conversations. As for training, although some department assistant managers pass on very basic, initial training to subordinates, and after that an occasional trick or two, most of the training at the Eagle is done by the Technology Department. On the whole, according to Mounts, Ornelas was superior in his use and troubleshooting of the new composing technology.
 

 In a later conversation, Mounts told Timmermeyer that he felt she had an attitude problem, and cited Timmermeyer’s comments about another employee, Joe Farris. Farris, a 30-year employee of the Eagle, had a negative personality and was a “complainer.” Timmermeyer had stated that Farris would never change, and was just “happy griping all the time.” (Compl., at 38).
 

 Timmermeyer also talked to Kindred, and asked her about what Mounts had said about the selection. Kindred told Timmer-meyer that Mounts told her that she (Kindred) did not have enough experience.
 

 There is a fact dispute between the parties about Ornelas’s qualifications. According to Timmermeyer, Ornelas had excessive tardiness and absenteeism. Both he and Kindred had received letters of reprimand from Franklin. Both had told Timmermeyer that they were afraid Franklin was going to fire them. Franklin wrote to Ornelas and Kindred on September 3, 1997, stating in part: “Substandard work, poor work habits, and unprofessional behavior are things of the past and will not be tolerated in the composing room. Recent terminations have proven this to be the case.” (Plf.Exh.F).
 

 According to Franklin, however, she did not reprimand Ornelas or Kindred, but had merely responded to a request by them for an explanation why they had
 
 *1204
 
 waited a long time to be made journeymen. There were no written reprimands in Ornelas’s personnel file. The Eagle also cites Performance Reviews of Ornelas and Kindred, which generally give them positive marks, except for absences, but also contain notations that both employees had been hospitalized.
 

 Assuming for present purposes that Mounts may have told the job applicants that he would be the sole decision-maker, Mounts did in fact consult with upper management (Vice President of Operations Kevin Desmond, Vice President of Human Relations Martha Jean McHaney, and his predecessor Franklin) about the selection. Mounts states in his affidavit that he told each of the three applicants to prepare for formal interviews for the position, and to prepare presentations about their plans for the department. He felt that Timmermeyer was disorganized, and acted like the interview was a mere formality. He also believed that technology skills were very essential to the job. He also felt that, when a new Monotype System was installed, Timmermeyer did not display much interest in it, and simply pushed the work off on Ornelas. He believed that Timmer-meyer was energetic but not well-focused and frequently gave co-workers the impression the Composing Room was in chaos because she was acting in crisis mode. This negatively affected department morale. He believed Ornelas was the better candidate.
 

 Timmermeyer disputes this. She states that Mounts told her in the interview that he was impressed with her job performance. She states in an affidavit that she learned the system promptly and efficiently. In contrast, according to Timmermeyer, Ornelas had trouble mastering computer systems, was tardy for system training, and never entirely mastered it.
 

 Desmond and Franklin have submitted affidavits, stating that they had observed Timmermeyer’s frantic work habits. They felt Ornelas, not Timmermeyer, had shown initiative in responding to technology changes. They felt Timmermeyer needed more plate-making experience. Desmond was concerned about Timmermeyer, and states that there were complaints from the Technology Department that Timmermeyer called them excessively for problems she could have solved. He also did not like her frantic work style, and had concerns with her weakness in technology. Desmond and Franklin felt Ornelas was the better candidate. McHaney agreed.
 

 In her response, Timmermeyer presents her affidavit which states that she had more newspaper industry experience than Ornelas or Kindred, that Ornelas had once made an error in plate-making, and that they had received the warning letter from Franklin. She states that Desmond had in fact complimented her on her ability to work calmly in a crisis. And she cites the affidavits of other workers who have stated that Timmermeyer had a calm attitude at work.
 

 After Ornelas was made Nightside Composing Manager, Timmermeyer was designated Assistant Nightside Composing Manager.
 

 At the time of the job decision, Mounts had no social friendship outside work with Ornelas.
 

 Conclusions of Law
 

 The central issue in the matter before the court is whether the plaintiff has evidence suggesting that the proffered rationales for the selection of Ornelas are a pretext for gender discrimination. The Eagle concedes for the sake of argument that Timmermeyer has" presented a prima facie case of discrimination. It contends, however, that the concerns of Mounts as to Timmermeyer’s leadership style and her ability to adapt new technology skills were the sole basis for his selection of Ornelas. In particular, the Eagle relies on the decision of the Tenth Circuit in
 
 Bullington v. United Air Lines,
 
 186 F.3d 1301 (10th Cir.1999). In that case the plaintiff alleged, in part, that she suffered from disparate treatment based on sex when it
 
 *1205
 
 failed to choose her as a flight officer. On the issue of pretext, the court -wrote:
 

 To establish pretext a plaintiff must show either that “a discriminatory reason more likely motivated the employer or ... that the employer’s proffered explanation is unworthy of credence.”
 
 Texas Dep’t of Community Affairs v. Burdine,
 
 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Plaintiff may accomplish this by demonstrating “ ‘such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer’s proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence.’ ”
 
 Morgan v. Hilti, Inc.,
 
 108 F.3d 1319, 1323 (10th Cir.1997) (quoting
 
 Olson v. General Elec. Astrospace,
 
 101 F.3d 947, 951-52 (3d Cir.1996)). However, the plaintiff’s “mere conjecture that [her] employer’s explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment.”
 
 Branson v. Price River Coal Co.,
 
 853 F.2d 768, 772 (10th Cir.1988).
 

 In this case, Ms. Bullington bases her pretext argument on the following evidence: disputes regarding things she said and did during the interview, the interviewers’ use of gender and age stereotypes, a comparison of her qualifications with those of successful flight officer interviewees, and statistical evidence. We conclude that, even viewing this evidence in the light most favorable to Ms. Bullington, it fails to demonstrate a genuine issue of fact as to whether United’s reasons for not hiring her were pretextual.
 

 First, Ms. Bullington lists numerous disputes she has with the notes and summaries prepared by her interviewers. The disputed “notes” are essentially the United representatives’ informal, handwritten notations of Ms. Bulling-ton’s responses to various questions during the inteiview. The “summaries” are typed memos in which the interviewer summarizes and assesses Ms. Bulling-ton’s performance and makes a final recommendation regarding hiring. Ms. Bullington claims the notes and summaries are not accurate reflections of her interview performance. Further, she contends that those inaccuracies amount to fact issues regarding the legitimacy of United’s proffered reason for not hiring her and that the district court improperly ignored them in granting summary judgment. We disagree.
 

 A review of the record shows that the vast majority of the “factual disputes” alleged by Ms. Bullington are in reality her opinion that the interviewers were wrong in their assessment of her qualifications.
 

 However, her own opinions about her qualifications do not give rise to a material fact dispute.
 
 See Simms,
 
 165 F.3d at 1329. Moreover, even if we were to assume that United misjudged Ms. Bullington’s qualifications, such evidence would not preclude summary judgment in this case. The relevant inquiry is not whether United’s proffered reasons were wise, fair or correct, but whether United honestly believed those reasons and acted in good faith upon those beliefs.
 
 See Sanchez v. Philip Morris Inc.,
 
 992 F.2d 244, 247 (10th Cir.1993) (“Title VII is not violated by the exercise of erroneous or even illogical business judgment.”);
 
 Kariotis,
 
 131 F.3d at 677 (“[Ajrguing about the accuracy of the employer’s assessment [of plaintiff’s performance] is a distraction, because the question is not whether the employer’s reasons for a decision are right but whether the employer’s description of its reasons is honest.” (Internal quotation marks and citations omitted.));
 
 Fischbach v. District of Columbia Dep’t of Corrections,
 
 86 F.3d 1180, 1183 (D.C.Cir.1996) (concluding relevant issue was whether the employer honestly believed in the reasons it offered for not promoting plaintiff and not the correctness or desirability of those reasons). Ms. Bullington pres
 
 *1206
 
 ents no evidence indicating United did not believe the interviewers’ assessment of her qualifications, and our review of the record reveals no evidence that United failed to act in good faith in reliance on those assessments. We therefore discern no showing of pretext.
 

 Likewise, we find little merit in Ms. Bullington’s argument that United based its employment decisions on gender and age stereotypes. Our review of the record reveals little that could be construed as stereotyped assumptions about the qualifications, work habits, or personality traits of female or older interviewees.
 
 See, e.g., Price Waterhouse v. Hopkins,
 
 490 U.S. 228, 251, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). Rather, Ms. Bull-ington’s argument merely takes issue with what she believes is an incorrect assessment of her communication skills, goals, and motivation level. As discussed above, Ms. Bullington’s opinion about the fairness or accuracy of the interviewers’ evaluation is not evidence of pretext.
 
 See Simms,
 
 165 F.3d at 1329.
 

 Next, Ms. Bullington offers a comparison of her qualifications with those of seven, other male and/or younger individuals that United interviewed and hired as flight officers. She claims United hired these individuals despite the fact many were less qualified than her or, in many cases, had the same deficiencies identified during her interview. As such, she argues, there is reason to disbelieve United’s proffered nondiscriminatory reasons for not hiring her. It is true that a comparative analysis of job applicants’ qualifications may be relevant in proving pretext where, as here, the employer claims lack of qualification as reason for an employment decision.
 
 See Sanchez v. Philip Morris,
 
 992 F.2d at 247. However, we emphasize that an employer does not violate Title VII by choosing between equally qualified candidates, so long as the decision is not based on unlawful criteria.
 
 See Burdine,
 
 450 U.S. at 259, 101 S.Ct. 1089. Therefore, pretext cannot be shown simply by identifying minor differences between plaintiffs qualification’s and those of successful applicants.
 
 See Sanchez v. Philip Morris,
 
 992 F.2d at 247-48;
 
 Chock v. Northwest Airlines, Inc.,
 
 113 F.3d 861, 864 (8th Cir.1997) (“[A] comparison that reveals that the plaintiff was only similarly qualified or not as qualified as the selected candidate would not raise an inference of racial discrimination.”). The disparity in qualifications must be “overwhelming” to be evidence of pretext.
 
 Sanchez v. Philip Morris,
 
 992 F.2d at 247.;
 
 see also Odom v. Frank,
 
 3 F.3d 839, 847 (5th Cir.1993) (difference in qualifications of applicants must be so apparent as “to jump off the page and slap us in the face” to support a finding of pretext).
 

 A comparison of Ms. Bullington’s qualifications with those of the other interviewees in this case gives us no reason to question United’s explanation for its hiring decision. Ms. Bulling-ton[’s] evidence does not show that she was overwhelmingly better qualified than the other candidates. At most, the seven other candidates were similarly qualified and the fact that United chose between them is not evidence of pretext.
 
 See Sanchez v. Philip Morris,
 
 992 F.2d at 247 (concluding no evidence of pretext where plaintiff failed to demonstrate that he was overwhelmingly better qualified that the other applicants).
 

 186 F.3d at 1317-1319 (footnotes omitted).
 

 The court also rejected plaintiffs argument that the district court gave improper deference to the business judgment of the airline. The court wrote that it found
 

 no error in the district court’s pronouncement that it “is not particularly well-suited to evaluating the qualifications that go into making a successful fine pilot at United Airlines” and that it “is peculiarly ill-suited to determine the best candidates.” We previously have recognized that district courts, when an
 
 *1207
 
 alyzing the pretext issue, do not sit as “super-personnel departments” free to second-guess the business judgment of an employer.
 
 Simms,
 
 165 F.3d at 1330. Thus, the court’s role in this case was not to determine if United’s hiring decisions were wise or fair, but rather, in the context of Ms. Bullington’s disparate treatment claim, if those decisions were motivated by discriminatory animus.
 

 Id. at 1318 n. 14. In the end, the plaintiff’s disparate treatment case against the airline was limited to her subjective view that she was the best qualified candidate for the job. The court recognized that “Ms. Bullington obviously has her own opinions about her qualifications for the flight officer position” but concluded that “[tjhose subjective opinions ... do not demonstrate a fact dispute about the genuineness of United’s assessment of her qualifications.” Id. at 1317, n. 13.
 

 There is, as in
 
 Bullington,
 
 no evidence that any gender animus played any role in the selection of the Nightside Composing Room Manager.
 
 [1]
 
 Rather, the case rests upon the plaintiffs subjective views that she was better qualified for the job than Ornelas or Kindred.
 

 The one qualification to this is an assertion by Timmermeyer in her response which might suggest that, at least in Desmond’s case, he did not have a negative impression of her workplace demeanor. Specifically, Timmermeyer avers that Desmond and another manager (Peter Pitz) complimented her for the way she dealt with “two crisis situations” at the office when she was covering for Devlin. (Tim-mermeyer. Aff. at 1Í 28). Pitz and Desmond have stated that they do not recall making any specific compliments to Tim-mermeyer, and that if a crisis occurs which is successfully handled, they typically compliment a group of employees who have worked on the matter.
 

 But this does not even rise to the level of a minor inconsistency. Timmermeyer at most has shown that she may have been complimented for her role in dealing with two instances of crisis at the newspaper. This does not contradict Desmond’s averment (Def.Exh. 5, at H 5) that he had on some occasions seen Timmermeyer “very flustered and not calm.”
 

 Further, there is nothing, save Timmer-meyer’s subjective opinion, to counter Mounts’s conclusion that he felt Timmer-meyer had not adequately prepared for the interview. Further, Mounts was concerned about Timmermeyer’s attitude and demeanor, but not in the same way as Desmond. That is, as Mounts states in his affidavit, he felt Timmermeyer “frequently gave her co-workers the impression that the work of the Composing department was in chaos because she behaved in a crisis mode” and that he had seen a decline in department morale when co-workers saw Timmermeyer “running around in panic.” (Mounts Aff. at 1114). Mounts’ concern is not that Timmermeyer could not deal with the occasional crisis, but that she frequently operated in “crisis mode” when it was not necessary.
 

 In
 
 Bullington,
 
 the plaintiff also argued pretext was demonstrated on the basis of alleged inconsistencies between the job interviewer’s notes and their eventual testimony. The court reviewed the alleged inconsistencies and found them to be “insignificant at best and too minor to give rise to an inference of pretext.” 186 F.3d at 1318 n. 15. That is the case here as well.
 

 
 *1208
 
 Beyond the question of Timmermeyer’s workplace demeanor and leadership style, it is uncontroverted that both Desmond and Mounts had concerns about Timmer-meyer’s ability to respond to technological innovations in the newspaper publishing industry. Both felt that Ornelas showed more initiative in this area, and that he was better equipped to deal with it. There is nothing to suggest that Mounts’s and Desmond’s concerns about Timmermeyer’s technology skills were pretext. Timmer-meyer’s previous Performance Assessment by Franklin acknowledged that she had “come a long way” in responding to the new technology, but also stated she had demonstrated a lack of willingness or “a trepidation” in “embrac[ing] this new knowledge.” (Franklin Aff. Attachment).
 

 The defendant has articulated legitimate, nondiscriminatory rationales for the selection of Ornelas over Timmermeyer, which the plaintiff has not shown are pre-textual. Accordingly, the plaintiffs discrimination claims will be dismissed.
 

 [1]
 

 . The plaintiff asserts, in her response to the motion for summary judgment, that Mounts "had a history of gender phobia.” (Resp. at 13, K 41). Plaintiff cites only her own affidavit for this diagnosis. In turn, the affidavit (Plf.Exh. A, at H 19) states only Timmermeyer’s own subjective opinion that, when Mounts temporarily left the Eagle in the mid-1990s, it was because he was irate that the job of composing room manager was given to Marcia Franklin. There is no objective evidence of why Mounts left the paper, or why he returned to it. There is no evidence Mounts ever made any sexist remarks in the workplace, or otherwise gave any objective indications of gender bias.