UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

————————————

No. 98-50506

————————————

CHERYL J. HOPWOOD; ET AL,

                                                   Plaintiffs,

CHERYL J. HOPWOOD,

                         Plaintiff-Appellant-Cross-Appellee

versus


STATE OF TEXAS; BOARD OF REGENTS OF THE TEXAS
STATE UNIVERSITY SYSTEM; LARRY R. FAULKNER, President
of the University of Texas at Austin in his official
capacity; UNIVERSITY OF TEXAS SCHOOL OF LAW; M. MICHAEL
SHARLOT, Dean of the University of Texas School of Law in
his official capacity; STANLEY M. JOHANSON, Assistant Dean
in his official capacity; THE UNIVERSITY OF TEXAS AT AUSTIN,

                         Defendants-Appellees-Cross-Appellants-
                                        Cross-Appellees

--------------------------------------------------------------------

DOUGLAS CARVELL; ET AL
                                                   Plaintiffs

DOUGLAS CARVELL
                         Plaintiff-Appellant-Cross-Appellee

and

KENNETH ELLIOTT; DAVID ROGERS

                         Plaintiffs-Appellees-Cross-Appellants

versus

STATE OF TEXAS; REGENTS OF THE UNIVERSITY OF TEXAS
SYSTEM; RITA CROCKER CLEMENTS; DONALD L. EVANS; PATRICK

C. OXFORD; A. W. RITER, JR.; A. R. SANCHEZ; WOODY L. HUNT;
CHARLES MILLER; RAUL R. ROMERO; TOM LOEFFLER, as members
of the Board

                    Defendants-Appellees-Cross-Appellants-
                                      Cross-Appellees

                  - - - - - - - - - -

          Appeal from the United States District Court
               for the Western District of Texas

                  - - - - - - - - - -
                  December 21, 2000

Before WIENER and STEWART, Circuit Judges, and LITTLE, District
Judge[*]

WIENER and STEWART, Circuit Judges:

     This higher education, reverse racial discrimination case is
before us on appeal for the third time.  The first appeal ("Hopwood
I") was interlocutory and affirmed the district court's denial of
intervention sought by several minority rights advocacy
organizations.[1]  The second appeal ("Hopwood II") followed the
district court's judgment on the merits ("Hopwood A")[2] of the
individual claims of Plaintiffs-Appellants-Cross-Appellees, Cheryl
J. Hopwood and Douglas Carvell, and Plaintiffs-Appellees-Cross-

---

     [*] District Judge of the Western District of Louisiana, sitting
by designation.

     [1] Hopwood v. Texas, 21 F.3d 603 (5th Cir. 1994)("Hopwood I"),
aff'g Hopwood v. Texas, No. Civ. A-92-CA-563-SS, 1994 WL 242362 at
*1 (W.D. Tex Jan. 20, 1994).

     [2] Hopwood v. Texas, 861 F. Supp. 551 (W.D. Tex 1994)("Hopwood
A").

2

Appellants, Kenneth Elliott and David Rogers (collectively, the "Plaintiffs"), against Defendants-Appellees-Cross-Appellants-Cross-Appellees, The University of Texas at Austin (the "University"), the University of Texas School of Law (the "Law School"), and the State of Texas, the Board of Regents of the University and its President, and the Dean and the Assistant Dean of the Law School (collectively, "Texas"), grounded in the denial of the Plaintiffs' admission to the Law School.[3]  Now, in "Hopwood III," each of the parties either appeals or cross-appeals one or more of the district court rulings made at the conclusion of an extensive bench trial[4] conducted pursuant to our remand from Hopwood II.  As a broad generalization, three areas dealt with by the district court in Hopwood B are implicated in this appeal:  That court's (1) ultimate finding of fact that none of the Plaintiffs had a realistic chance of being offered admission to the Law School in 1992, even under a constitutionally valid, race-blind admissions program; (2) rulings on attorneys' fees; and (3) grant of an injunction prohibiting any consideration of race whatsoever in the Law School's admissions process.  In addition, Texas would have us disregard the law of the case doctrine and reverse the prior panel's decision in Hopwood II. We set forth below our reasons for affirming (1) the district

_____

[3]  Hopwood v. Texas, 78 F.3d 932 (5th Cir.), cert. denied 518 U.S. 1033 (1996) ("Hopwood II").

[4]  Hopwood v. Texas, 999 F. Supp. 872 (W.D. Tex 1998)("Hopwood B").

court's factual findings that the Plaintiffs would not have been offered admission in 1992 under a race-blind system, and (2) that court's awards of attorneys' fees. We also express our reasons for declining to reconsider the substance of Hopwood II, and for reversing the court's injunction against any consideration of race in the Law School's admission process and remanding that issue for further consistent proceedings.

## I.
### FACTS AND PROCEDURE

In Hopwood A, the case underlying the Hopwood II appeal, the district court held that the Plaintiffs had failed to establish by a preponderance of the evidence that they would have been offered admission to the Law School under a constitutional admissions system.[5] On appeal, a panel of this court held that, under the burden-shifting scheme of Mt. Healthy City School District Board of Education v. Doyle,[6] the Law School must bear the burden of proving by a preponderance of the evidence that, even under a race-blind admissions system, the Plaintiffs would not have been offered admission.[7] The Hopwood II panel[8] stated that, "[i]n the event that

---

[5] Hopwood A, 861 F. Supp. 551 (W.D. Tex. 1994).

[6] 429 U.S. 274 (1977).

[7] See Hopwood II, 78 F.3d at 956-57.

[8] As Judge Wiener specially concurred in Hopwood II, differing with portions of the panel majority's reasoning and parts of its judgment, references in this opinion to the holdings of the "panel" in Hopwood II do not always reflect those of a unanimous panel.

4

the law school is unable to show (by a preponderance of the evidence) that a respective plaintiff would not have been admitted to the law school under a constitutional admissions system, the court is to award to that plaintiff any equitable and/or monetary relief it deems appropriate."[9]

In the spring of 1997, following remand from Hopwood II, the district court conducted a four-day bench trial. The Law School called one expert witness on the question of causation, i.e., what caused the Plaintiffs to be denied admission in 1992 and whether they would have been offered admission under a race-blind system. That witness was Professor Olin Guy Wellborn, a faculty member of the Law School. He presented both a primary report and a supplemental report analyzing whether the Plaintiffs would have been admitted under a constitutional, race-blind admissions system, concluding that none of the four plaintiffs would have been. After considering Professor Wellborn's reports and testimony, as well as the testimony of several members of the Law School's admissions committee and the Plaintiffs themselves, the district court found that the Law School had proved by a preponderance of the evidence that none of the Plaintiffs would have been admitted to the law school under a constitutional admissions system.[10]

The district court nevertheless proceeded to make alternative

---

[9] Id. at 957.

[10] Id. at 879.

factual findings and legal conclusions on the issue of damages. These would only be used in the event that the Plaintiffs should be successful in an appeal —— this appeal —— of the trial court's causation findings.[11] Finally, the district court entered a permanent injunction prohibiting any consideration of race, for any purpose, in the Law School's admissions process.

Following the initial trial of this action in Hopwood A, the Plaintiffs had requested an award of attorneys' fees pursuant to 42 U.S.C. § 1988.[12] The district court denied the request, finding that the Plaintiffs, "although prevailing parties under the statute, only attained de minimis relief."[13] When the adverse rulings in Hopwood A were appealed to us, we reversed and remanded the attorneys' fees issue with instructions for the district court to award reasonable attorneys' fees.[14] Before the commencement of

---

[11] In these conditional damages findings, the court concluded that (1) each Plaintiff would be entitled to one dollar in nominal damages, id. at 923; (2) Hopwood would not be entitled to any economic damages but would be entitled to $6,000 for mental anguish, id. at 906, 908; (3) Carvell would be entitled to $40,036 in economic damages, being the difference between the tuition at the Law School and the tuition at Southern Methodist University where Carvell attended law school, id. at 909; but that Carvell did not suffer any compensable emotional injuries, id. at 910; and (4) Rogers and Elliott would not be awarded any economic damages, id. at 910-11.

[12] See Hopwood B, 999 F. Supp. at 911.

[13] See id.

[14] Hopwood v. Texas, No. 95-50062 (5th Cir. May 17, 1996)(order vacating judgment denying attorneys' fees and remanding with instructions that reasonable attorneys' fees should be granted).

6

the Hopwood B bench trial on remand, the district court entertained supplemental applications for attorneys' fees and made its final decision on the issue in the memorandum opinion resolving the matters raised at that trial.[15]

The Plaintiffs sought $853,847.69 for their counsel in payment for 4,840.56 hours of work related to the May, 1994 trial of Hopwood A. They also asked for $614,138.56 for their counsel in payment for 2400.85 hours of work related to the appellate phase of this litigation. The district court denied the portions of the fee request for time spent on (1) public and media relations, (2) opposing the attempted interventions by the Thurgood Marshall Legal Society, the Black Pre-Law Association, the NAACP Legal Defense Fund, and the Mexican-American Legal Defense and Educational Fund, and (3) any legal work done after our remand in Hopwood II because the Plaintiffs were not prevailing parties as to any issues resolved after that remand. The court reduced the number of hours spent for travel by one-half to reflect its judgment that travel should be billed at a lower rate than active legal work, and reduced all hours submitted by the Plaintiffs' counsel by twenty-five percent to account for duplicative work product and lack of billing judgment.[16] The court then reviewed current billing rates

---

[15] Hopwood B, 999 F. Supp. at 923-24.

[16] The district court reduced the Center for Individual Rights' hours by thirty-five per cent, finding its "padding" to be worse than that of the others.

7

for each of the Plaintiffs' counsel[17] and reduced all submitted rates for the stated purpose of bringing those rates more into line with the prevailing legal market rate in the Austin, Texas trial venue. After multiplying the adjusted number of hours by the adjusted hourly rates, the district court arrived at tentative fee awards for each of the Plaintiffs' counsel. It then reduced the tentative awards for the trial attorneys by fifteen percent to reflect the lack of success in obtaining any injunctive or monetary relief for the Plaintiffs individually. The court concluded its task with numerous tables displaying the relevant calculations.[18] This appeal followed.

## II.
## ANALYSIS

### A. Admission to the Law School

#### 1. Standard of Review

The district court's determination that the Plaintiffs would not have been admitted to the Law School under a constitutional admissions system is a question of fact, which we review for clear error.[19] We review de novo whether the district court faithfully

---

[17] The district court used current rates to compensate for delay in payment.

[18] See Hopwood B, 999 F. Supp. at 919-23.

[19] See, e.g., East Jefferson Coalition for Leadership and Development v. Parish of Jefferson, 926 F.2d 487, 491 (5th Cir. 1991) (finding that the district court's determination of whether preconditions for a claim under the Voting Rights Act had been satisfied was a question a fact to be reviewed for clear error).

8

and accurately applied our instructions on the burden of proof on remand from Hopwood II.[20] We review for clear error the district court's weighing of the evidence in light of the burden of proof.[21]

## 2. Burden of Proof

The Hopwood II panel noted that, even though as a general rule plaintiffs seeking money damages must bear the burden of proving that they have been injured, there can be a shift of burden on proof of discrimination.[22] That panel concluded that the Mt. Healthy methodology is appropriate in this case, and that under that methodology's burden-shifting minuet, the Law School should have a chance to prevail by showing, through a preponderance of the evidence, that it would have reached the same admission decisions even in the absence of unconstitutional conduct.[23] The Hopwood II panel stated that "[i]n the event that the law school is unable to show (by a preponderance of the evidence) that a respective plaintiff would not have been admitted under a constitutional admissions system, the court is to award that plaintiff any equitable and/or monetary relief it deems appropriate."[24]

---

[20] See Odom v. Frank, 3 F.3d 839, 843 (5th Cir. 1993) (concluding that in an appeal from a bench trial, we review issues of law de novo).

[21] Id.

[22] Hopwood II, 78 F.3d at 956.

[23] Id. at 956-57.

[24] Id. at 957.

9

The Plaintiffs argue that on remand the district court failed to follow the Hopwood II panel's instructions on burden of proof, pointing to, among other things, the district court's criticism of the panel's instruction to use the Mt. Healthy burden-shifting methodology. The Plaintiffs insist that if the district court had followed the panel's instructions faithfully by requiring the Law School to carry the burden of proof, Texas could not have prevailed because the burden was "impossible" to carry. We disagree.

First, even though the district court did express its disagreement with our instruction to apply the Mt.Healthy analysis,[25] there is no indication from the record that, despite having voiced its criticism, the district court failed to follow the panel's instructions. The court proclaimed that "[t]he Court is cognizant, however, of the panel's instructions on remand, and it will faithfully and responsibly execute them."[26] Our review of the record demonstrates that in fact the court did faithfully and

---

[25] The district court included a lengthy discussion of its own views on the applicability of the Mt. Healthy analysis. See Hopwood B, 999 F. Supp. at 883-885. It observed that, among other things, the panel's analysis was incomplete because it presupposed that race was a substantial or motivating factor in every denial of a nonminority candidate's application for admission, regardless of the applicant's qualifications. Id. at 883. The district court noted that mathematically this could not be true: Even if all 96 offers of admission made to minorities had been made to nonminorities, approximately 1400 nonminority applicants would still have been denied admission. Id. Therefore, said the court, only 7 percent of resident nonminority applicants were affected by the Law School's use of racial preferences. Id.

[26] Id. at 884-85 (emphasis added).

10

responsibly apply the Mt. Healthy burden as instructed. The Law School put forth plenteous evidence in the form of Professor Wellborn's expert reports, as well as affidavits and testimony from admissions committee members, in support of the proposition that the Plaintiffs would not have been admitted to the Law School in 1992 under a race-blind admissions procedure. In sum, the district court expressly disagreed with our remand instructions regarding application of Mt. Healthy but it clearly followed them.

Next, the Plaintiffs argue that if the district court had faithfully applied the Mt. Healthy burden-shifting analysis, it would have had to find that the burden was "impossible" for the Law School to carry. The Plaintiffs note that in his original 1994 judgment, Hopwood A, the same district judge stated that "it is virtually impossible to establish the outcome of a comparison of the plaintiffs' applications against the other applicants, whether minority or nonminority."[27] The Plaintiffs also refer us to statements by several of the Law School's administrators and admissions committee members voicing the opinion that to determine whether a candidate would have been admitted under a race-blind system would require starting the admissions process over and reexamining every file.

We do not share the Plaintiffs' interpretation of the Hopwood II instructions. That opinion merely requires that the Law School

_____

[27] Hopwood A, 861 F. Supp. at 582 n.86.

11

carry its burden using "a constitutional admissions system."[28] Nowhere does it state that the Law School must replicate the 1992 admissions process in its entirety or that review of every file is required if the Law School were to meet its proof burden. Furthermore, we find no jurisprudential support for the proposition that a defendant must employ any particular evaluation system or method to carry its burden of proof in a discrimination case. Statements by Law School officials recognized that recreating the 1992 process would have been extremely difficult. Moreover, because doing that was not mandated by Hopwood II or by precedent, the district court on remand did not err in allowing the Law School to try to meet its burden of proof through the demonstrated application of a hypothetical system free of racial preferences. In other words, the district court committed no error by allowing the Law School to attempt to meet its Mt. Healthy burden without replicating the 1992 admissions process.

3. Admission Under a Race-Blind System

    a. 1992 Admissions Procedure

To evaluate the quality of Professor Wellborn's testimony, we must start with an understanding of the admission procedure that was employed by the Law School in 1992, when the Plaintiffs

---

[28] Hopwood II, 78 F.3d at 957.

12

applied. In that year, the Law School received 4,494 applications for approximately 500 available seats. Initially, each application was assigned to one of the three administrative categories, based solely on the applicant's Texas Index ("TI") score. The TI score is determined independently by the Law School Data Assembly Service ("LSDAS") using the applicant's undergraduate grade point average ("GPA") and Law School Admissions Test ("LSAT") score. The three categories were (1) presumptive admit, (2) discretionary zone, and (3) presumptive deny.

The TI scores needed for placement in the various categories were lower for minority[29] applicants than for nonminority applicants. Professor Stanley Johanson chaired the admissions committee in 1992 and had sole responsibility for setting the cutoff scores for the three categories. In 1992, these cutoff scores were adjusted several times to increase the number of presumptive admits. By March 1992, Professor Johanson had set the presumptive admit threshold for nonminority applicants at a TI score of 199 and the presumptive denial ceiling for those applicants at 192.[30] All applicants with scores between 192 and 199 went into the discretionary category. For minority applicants, however, the presumptive admit threshold was 192 and the

_____

[29] The term "minority" as used in the Law School's admissions procedure refers only to African Americans and Mexican Americans.

[30] Hopwood B, 999 F. Supp. at 880 (citation omitted).

13

presumptive denial ceiling was 179.[31]  Once an application had been placed in one of the three administrative categories, it was subject to different procedures for determining whether admission would be offered.

### i. Presumptive Admits

The file of a presumptive admit application would be reviewed by Professor Johanson to ensure that the TI score was not artificially inflated by a high GPA from a noncompetitive college or university or by a noncompetitive major.[32]  Any presumptive admit applicants whom he found to have "questionable files" were lowered to the discretionary zone for further review.[33]  The rest of the applicants in the presumptive admit category were offered admission by Professor Johanson without consultation with other members of the admissions committee.[34]

### ii. Discretionary Zone

The nonminority applications in the discretionary zone were separated into groups of thirty, and each group was then reviewed by three members of the admissions committee.[35]  Each group's three

---

[31] Id.(citation omitted).

[32] Id. (citation omitted).

[33] Id. (citation omitted).

[34] Id. (citation omitted).

[35] The admissions committee in 1992 included nine professors, two assistant deans, and four students.  Hopwood B, 999 F. Supp. at

committee members would independently review every file in that group of thirty. Each committee member could vote to offer admission to approximately nine of the thirty applicants whose files that he or she reviewed. Applicants in the discretionary zone who received either two or three favorable votes were offered admission; those who received one favorable vote were placed on the waiting list; and those who received no favorable votes were turned down.

### iii. Minority Applicants

Three members of the admissions committee served on a special minority subcommittee that reviewed the files of all minority applicants in the discretionary zone.[36] This subcommittee would identify minority applicants whom they deemed to be strong candidates for admission and would prepare summaries of each for review by the full admissions committee.

### iv. The Plaintiffs

Plaintiff Hopwood had a TI score of 199. She had been graduated from California State University-Sacramento with a GPA of 3.8 and an LSAT score in the 83rd percentile and had received an associate's degree in accounting from Montgomery County Community College. Hopwood's TI score of 199 placed her in the presumptive admit category; however, after reviewing her file, Professor

_____

879.

[36] Id. at 880.

Johanson downgraded her application to the discretionary zone, concluding that her GPA was inflated by the noncompetitive nature of her community college and undergraduate university.[37] On review by three members of the admissions committee, Hopwood received one vote. This one vote, cast by Assistant Dean Laquita Hamilton, put Hopwood on the waiting list,[38] from which she was ultimately denied admission.

Plaintiff Carvell had a TI score of 197, which placed him in the discretionary zone. Carvell had been graduated from Hendrix College in Arkansas with a degree in political science and a GPA of 3.28. He took the LSAT twice, scoring in the 61st percentile the first time, and in the 91st percentile the second time. His 197 TI score reflects only the second, higher LSAT score[39]; when averaged, his LSAT score would have placed him in the 76th percentile. Carvell received one vote for admission from a student member of the admissions committee, presumably placing him on the waiting list, from which he never received an offer of admission.

Plaintiff Elliott also had a TI score of 197, placing him in the discretionary zone. He had been graduated from the University with a bachelor's degree in accounting. He had a GPA of 2.98 and scored in the 95th percentile on his LSAT, but received no votes for

---

[37] Id. at 881.

[38] In 1992, there were separate waiting lists for minority and nonminority applicants.

[39] Id. at 881 n.18.

16

admission. This resulted in his automatic denial of admission.

Plaintiff Rogers also had a TI score of 197 which placed him in the discretionary category. He had been graduated from the University of Houston-Downtown (UH-D) with a degree in professional writing. Before attending UH-D, he had attended the University, where he was placed on academic probation once and dismissed twice for failing grades. Rogers's GPA at UH-D was 3.13 and his LSAT was in the 94th percentile, but he received no votes for admission.

The median GPA for all students entering the Law School from the 1992 admissions process was 3.52 and the median LSAT score was in the 89th percentile. The Law School offered admission to 637 Texas residents, of which 541 were nonminority applicants and 96 were minority applicants.[40]

b.  Expert Report and Testimony

The Law School proffered Professor Wellborn as an expert witness on the question whether the Plaintiffs would have been admitted to the Law School under a race-blind admissions procedure. Professor Wellborn is a tenured faculty member of the Law School and has served on the admissions committee since 1979, having chaired it in 1992. As the foundation for his trial testimony, Professor Wellborn presented a long and comprehensive expert report which was followed by a supplemental expert report.

i.  Primary Report

---

[40] Id.

17

In his primary report, Professor Wellborn analyzed the way that the 1992 admissions procedure operated with respect to nonminority candidates. He then demonstrated how that procedure, if extended to all candidates, would yield the same total number of admission offers under a race-blind system. Professor Wellborn also explained the relationship between the TI scores and offers of admission to resident nonminority applicants, concluding that 89 percent of such applicants with Hopwood's TI score of 199 were admitted. He also showed that, of all candidates with a TI score of 197 (as achieved by Carvell, Elliott, and Rogers), only 59 percent were admitted. Professor Wellborn then determined that if this exact procedure were used for all 1992 applicants, regardless of race or ethnicity, too few offers would have been forthcoming. Consequently, he lowered the presumptive admit threshold from 199 to 198 and determined that 90 percent of the applicants with TI scores between 196 and 199 would be admitted, and that 70 percent of the applicants with a TI score of 197 would be admitted.

Professor Wellborn found that 61 of the 68 applicants with Hopwood's TI score of 199 were admitted, including four minority applicants. He postulated that, under a race-blind system, there would have been one more offer of admission. He then compared the four admitted minority applicants, Hopwood, and the other denied nonminority applicants, as potential candidates for this one additional spot. Professor Wellborn demonstrated that (1) all four minority applicants were "clearly stronger" candidates for

18

admission than Hopwood, (2) three of the denied nonminority applicants were clearly stronger than Hopwood, and (3) two more denied nonminority applicants were comparable to her. Professor Wellborn concluded that, just as it was in the actual 1992 process, Hopwood's file would have been placed in the discretionary voting zone, and in the end she would not have received an offer of admission.

Professor Wellborn found that 45 of 72 applicants at Plaintiffs Carvell, Elliott, and Rogers's TI score level of 197, including one minority applicant, had been offered admission. He projected that under a race-blind system, six additional offers would have been made at the 197 TI level. Professor Wellborn then compared the files of the one admitted minority candidate, the three Plaintiffs who had 197 TI scores, and the remaining nonminority applicants with that score who had been denied admission. As a result of this exercise, Professor Wellborn concluded that the minority applicant would not have been admitted, and that there would have been a total of seven additional offers at the 197 TI level. He observed that seven of these nonminority applicants stood out as the strongest, all of whom were stronger than Hopwood and the other three Plaintiffs. Additionally, Professor Wellborn identified four more applicants at the 197 TI level who were stronger than Carvell, Rogers, and Elliott, adding that Elliott and Rogers were among the weakest applicants at the 197 level. He offered his opinion that, although Carvell was a

19

stronger applicant than Elliott and Rogers, Carvell still would have been in the bottom half of all applicants with TI scores of 197. Professor Wellborn also explained that because Carvell took the LSAT twice, his scores should have been averaged by the LSDAS, which would have placed him in a lower TI index group from the start.

### ii. Supplemental Report

Professor Wellborn was asked to identify (1) all 1992 resident minority (African-American and Mexican-American) admittees who would likely have been denied admission in a race-blind process and (2) all resident nonminority applicants who were denied admission but would have been offered admission in a race-blind process, ahead of the minority applicants identified in the answer to question (1). He did this in his supplemental report.

Professor Wellborn testified that, in completing this analysis, he examined the LSDAS reports of all admitted minority applicants and all denied nonminority applicants with a TI score above 190, and that he then examined the files[41] of those who appeared to be viable candidates based on the LSDAS report. In examining the reports and files, Professor Wellborn applied identical standards to the minority and nonminority candidates and considered the criteria that the Law School had previously identified as standards used for admission. He explained that the

---

[41] Files include the applicant's personal statement, letters of recommendation, and application.

20

most important factors for admission are the LSAT score and undergraduate academic record, which are weighted about equally. He stated further that the personal statement, letters of recommendation, and other materials in the file can be important in some instances. In addition, Professor Wellborn acknowledged that even though the LSDAS treats all GPAs alike for purposes of calculating the TI index score, file reviewers customarily take cognizance of the applicant's class rank and major, the mean LSAT score for the applicant's college, and the applicant's college transcript.[42] He added that comparing the colleges' mean LSAT scores is the best way of evaluating the various colleges and universities in terms of the caliber of their respective student bodies.[43]

When Professor Wellborn completed his examination of these files, he identified 18 minority applicants who, in his opinion, would likely have been admitted without regard to race, and two more minority applicants who, although weaker than the 18, might have been admitted. He labeled the first 18 minority applicants Group A and the two additional minority applicants as Group B.

Professor Wellborn next noted that the Law School made 96 offers of admission to resident minority applicants in 1992. After

_____

[42] The applicant's class rank, major, and the LSAT mean for the college are all shown on the LSDAS report.

[43] The college LSAT mean is the average LSAT score of students from that college. See Hopwood B, 999 F. Supp. at 888 n.34.

21

subtracting the 18 from Group A (those whom Professor Wellborn determined probably would be admitted under a race-blind system), 78 offered places remained available for denied nonminority applicants. In 1992, 398 nonminority Texas residents with TI indexes above 190 (including the four Plaintiffs) were denied admission. Therefore, concluded Professor Wellborn, fewer than twenty percent of these 398 candidates would have received one of the 78 additional offers of admission under a race-blind system. He also examined the LSDAS reports for each of the 398 resident nonminority applicants with a TI score above 190 who had been denied admission, then examined the files of those applicants among the 398 who, based on his review of the LSDAS report, appeared to be viable candidates. From among those, Professor Wellborn narrowed the remaining nonminority applicants to the 78 whom he found to be the best candidates. He identified these 78 applicants as Group C, then selected the next-best 20 applicants and identified them as Group D. None of the Plaintiffs qualified for inclusion in Group C or Group D. He testified that his comparison of the files of all applicants in the four identified groups further confirmed the weakness of the Plaintiffs' applications.

After completing the selection of the 118 applicants comprising his four groups, Professor Wellborn identified four common characteristics: (1) an LSAT in the 80th percentile or higher; (2) a college class rank in the 60th percentile or higher; (3) graduation from a college with an LSAT mean of 30 or higher;

22

and (4) no more than one year in a community or junior college. He went on to explain his reasons for selecting any applicants who did not meet one of these criteria.

Finally, Professor Wellborn identified the specific weaknesses in each of the Plaintiffs' files that, in his opinion, would have adversely affected their chances of being offered admission. He noted that Plaintiff Elliott was in the bottom half of his class at the University and had no letters of recommendation from faculty. Professor Wellborn also pointed out that only one presumptive admit in Group A had a class rank as low as Elliott's.

Professor Wellborn observed that Plaintiff Rogers's college record was a "worse liability" than Elliott's. He explained that over the course of three separate stints at the University, Elliott had been placed on scholastic probation once and dismissed for academic failure twice. Professor Wellborn remarked that, although Elliott subsequently did achieve a high GPA at UH-D, this school had a "strikingly low" LSAT college mean of 26, adding that an LSAT college mean of 26 was among the lowest he had seen during his many years of service on the Law School admissions committee. He also noted that Rogers's file contained no letters of recommendation.

Professor Wellborn reported that Hopwood's degree school, Cal State at Sacramento, had an LSAT college mean of 28, and that 60 of her credits were from a community college. He acknowledged that Hopwood's LSAT score in the 83rd percentile would be adequate if combined with a reliable college record, but that alone her LSAT

23

was not high enough to overcome the doubts raised by her undergraduate background. Professor Wellborn also mentioned that Hopwood's file contained no letters of recommendation.

In analyzing Plaintiff Carvell's application, Professor Wellborn observed that when this candidate's two LSAT scores are averaged, he has a score in the 76th percentile. Professor Wellborn acknowledged that some of the applicants in his four groupings had low LSAT scores, but explained that in each instance the weak LSAT was counterbalanced by a "very strong" college performance. Professor Wellborn contrasted Carvell's college record, noting that Carvell was in the 59th percentile at a college with an LSAT mean score of 32. He also characterized Carvell's two faculty letters of recommendation as ranging between "unimpressive to downright negative."

c. Plaintiffs' View of Texas's Evidence

The Plaintiffs proffered no expert witness of their own, electing instead to attack the work of Professor Wellborn. They ultimately argue that Professor Wellborn's analysis was not "remotely adequate" to carry the Defendants' burden. As we have noted, the district court's eventual determination whether the Law School carried its burden of establishing that the Plaintiffs would have had no reasonable chance of being offered admission under a race-blind admissions system is a question of fact that we review

24

for clear error.[44]

Plaintiffs Carvell and Hopwood argue that Professor Wellborn's supplemental report is unreliable because he began its analysis by using these Plaintiffs' applications as a "floor," then seeking to identify applications that were stronger. Hopwood and Carvell also contend that Professor Wellborn cherry-picked aspects of the 1992 system, embracing those that favored his position while ignoring or rejecting aspects that were unfavorable. They point to his assumption that all of the nonminority applicants who were admitted in 1992 would have been admitted under a race-blind system and his rejection of the possibility that Hopwood and Carvell, who received one vote each, would have been selected ahead of candidates who received no votes.

To repeat, the Hopwood II panel's remand instructions did not require the Law School to replicate precisely the admissions system that it had employed in 1992; rather, the Law School was simply required to use any reasonable race-blind system. Professor Wellborn clearly stated in his supplemental report that in his evaluation he used the same criteria for minority and nonminority applicants alike. The assumption in his supplemental report that only 96 seats would have been open for admission because all nonminority applicants admitted in 1992 would have been admitted under a race-blind system is logical. Not even the Plaintiffs

---

[44] Odom, 3 F.3d at 843.

25

dispute that it was more difficult for nonminority applicants to gain admission in 1992 than it would have been under a race-blind system; indeed, that is at the core of their argument of reverse discrimination. It is therefore logical to conclude that those nonminority applicants who were admitted in 1992 would have been admitted under a race-blind system.

Hopwood and Carvell nevertheless contend that Professor Wellborn's assumption that the nonminority candidates who were admitted in 1992 would have been admitted under a race-blind system is inconsistent with his refusal to consider the fact that Hopwood and Carvell received one vote each in 1992, placing them on a waiting list.[45] The flaw in their argument lies in their failure to recognize that in 1992 there were two waiting lists, one for nonminority applicants and one for minority applicants, a situation that, by definition, could not exist in a race-blind system. Coupled with Professor Wellborn's testimony regarding the aberrant nature of the one vote that each of them received — Hopwood's cast

---

[45] Hopwood and Carvell also argue that failure to consider that each of them received one vote for admission is in direct contradiction to a statement made by Professor Johanson in another discrimination lawsuit, Malooly v. Texas, Civ. No. A96CA229SS (W.D. Tex. 1994). The record contains an affidavit by Professor Johanson from that case in which he avers that Mr. Malooly received no votes for admission and that candidates with one, two, or three votes would have been considered superior to Malooly. We do not agree that this statement necessarily makes the method employed by Professor Wellborn inherently unfair or illogical. Furthermore, the statement would have more weight if it were Professor Johanson rather than Professor Wellborn who developed and presented the expert testimony in the instant case.

26

for diversity on the basis of age, marital status, and childcare responsibilities, and Carvell's cast by a student member of the Committee —— makes problematical the giving of any significance to their positions on the 1992 waiting list in the context of a race-blind system that would have a single, race-blind waiting list and no certainty that, under such a system, a single vote would get an applicant on the waiting list at all.

Professor Wellborn elected to employ a fair alternative. He reconsidered all applicants, both the admitted minority candidates and all of the nonminority candidates, who had TI scores in the same range as the Plaintiffs (above 190). Thus, even though Hopwood and Carvell got no special consideration from Professor Wellborn for their respective votes, neither did the admitted minority applicants —— even those who received one or two votes. Under Professor Wellborn's reconstruction, Hopwood and Carvell received treatment equal to all denied minority candidates in their TI range. Professor Wellborn examined the LSDAS report of each one of these applicants and carefully re-examined the entire file of each of those whom he considered to be a viable candidate. All this was done using race-blind criteria.

The Law School supplied additional evidence that cast light on the one vote received by both Hopwood and Carvell. Assistant Dean Laquita Hamilton, who had cast Hopwood's one vote, testified, and provided an affidavit stating, that she had voted for Hopwood in the belief that Hopwood would bring diversity to the incoming class

27

because she was an older student, had worked while in school, and was raising a handicapped child. Dean Hamilton's vote for Hopwood clearly was not cast in the belief that Hopwood was academically more qualified than other applicants based on the system's criteria of LSAT score, college academic record, personal statement, and letters of recommendation.

Carvell's one vote was cast by a student member of the admissions committee. Professor Johanson testified that sometimes the votes of student members of the committee are aberrant departures from the admissions decisions norm, noting that Carvell received no votes from non-student members of the admissions committee.

Finally, the Plaintiffs would make much of Professor Wellborn's acknowledgment that he made a number of small errors in his analysis. These include such things as misstating that each committee member could vote for nine of the 30 applicants in the group of discretionary zone candidates when in fact each could vote for 10. The Plaintiffs also stress that Professor Wellborn failed to consider the difference between applicants with two-digit scores under an older LSDAS system and those with a three-digit TI index in the newer LSDAS system. We have considered each of the flaws singled out by the Plaintiffs and are satisfied that, neither alone nor in combination, are they sufficient to affect the validity of the studies or to impugn Professor Wellborn's ultimate conclusions.

d.    <u>Plenary Evaluation of Defendants' Evidence</u>

The nature and history of this case have influenced us to review the record de novo, including the Plaintiffs' LSDAS reports and files, all of the LSDAS reports included in Professor Wellborn's report, and the additional application files contained therein. As a result we are further convinced that the district court did not clearly err in finding that the Plaintiffs would not have been offered admission to the Law School under a race-blind admissions system.

The application file of each Plaintiff includes at least one significant weakness. Even though Hopwood's LSAT score was in the 83rd percentile, she had received her undergraduate degree from a relatively weak institution, had garnered at least 60 hours at a community college, and had earned her bachelor's degree from a school with a college LSAT mean of 28. Less than 2 percent of nonminority applicants admitted in 1992 had been graduated from schools with college LSAT means of 28 or below.[46] Furthermore, Hopwood's file contained no letters of recommendation or personal statements. Testifying members of the admissions committee in addition to Professor Wellborn agreed unanimously that Hopwood's undergraduate record and degree institution made her "not well prepared academically" and "very weak in comparison with the

---

[46] The 1992 LSAT means at other colleges demonstrate the relative weakness of this LSAT mean. Harvard University (40); Duke University (39); Rice University (38); Trinity University (36); The University of Texas at Austin (between 34 and 35); Texas A&M University (33).

overwhelming credentials of so many" of the other applicants.

Plaintiff Carvell took the LSAT twice, and even when averaged, his LSAT score was only in the 76th percentile, well below the median of 89th percentile of those admitted in 1992. Carvell's 3.28 GPA was also well below the 3.53 median for applicants admitted in 1992, and his file contained one distinctly negative letter: One of his college professors had written that he was "disappointed" in Carvell's grades and that Carvell had a "mediocre" and "uneven" academic performance. Other members of the admissions committee uniformly agreed that Carvell's undergraduate academic performance was "unimpressive."

Plaintiff Rogers also had a relatively weak undergraduate record. Initially he had attended the University, where he was not only placed on academic probation but was twice dismissed for failing grades in a period of three and one-half years. Even though Rogers did eventually graduate with a GPA of 3.13, his degree institution, UH-D, had a very low mean LSAT score of 26, and no letters of recommendation were provided.

Plaintiff Elliott's LSAT score in the 95th percentile was quite good, but his GPA at the University was only 2.98. In his own personal statement, Elliott acknowledged that in undergraduate school he was "an average student, studying when I needed to, partying more than I should, and not managing my time efficiently." Elliott candidly admitted that his undergraduate academic performance "is not of the caliber expected by the University of

30

Texas School of Law."[47]

The Plaintiffs' arguments criticizing the Law School's evidence were presented fully and forcefully to the district court by able counsel and were considered in depth by that court.[48] Its analysis of the Plaintiffs' criticisms of Professor Wellborn's analysis was painstakingly thorough. The district court independently evaluated Professor Wellborn's methodology by reviewing hundreds of application files itself.[49] Our equally painstaking review of the entire record convinces us that the district court was both indefatigable and disciplined in carefully considering all the evidence and was equally diligent in its consideration and application of the law and arguments presented by all the attorneys. We conclude that the district court's ultimate finding that the Plaintiffs would have had no reasonable chance of being admitted to the Law School under a race-blind admission system was not merely free of reversible error but was eminently correct.[50]

---

[47] After Elliott failed to gain admission, his father wrote to the Law School indicating that Elliott's friends and family believed that he was not offered admission because of "the mandatory minority and women quotas."

[48] See Hopwood B, 999 F. Supp. at 889-92.

[49] Id. at 893.

[50] As we affirm the district court's finding that the Plaintiffs would not have been offered admission to the Law School in 1992 under a constitutionally valid system, we need not address the district court's alternative findings on damages.

B.    Hopwood II Revisited

   1.    Law of the Case

We could not reconsider the merits of Hopwood II and reverse or revise it, as Texas urges, without first clearing a very substantial hurdle:  The law of the case doctrine.  Under the strictures of that maxim, "we will not reexamine issues of law addressed by a prior panel opinion in a subsequent appeal of the same case unless: (i) the evidence on a subsequent trial was substantially different, (ii) controlling authority has since made a contrary decision on the law applicable to such issues, or (iii) the decision was clearly erroneous and would work a manifest injustice."[51]  Texas acknowledges that the first two exceptions to this doctrine, which bars a subsequent panel from reversing or disregarding the holding of a prior panel, do not apply to the instant case.  Texas contends, however, that the third exceptional justification for departing from law of the case does apply here; that the Hopwood II panel decision is "clearly erroneous" and will "work a manifest injustice" if it is not overturned.

In the context of the law of the case doctrine, "clearly erroneous" is a very exacting standard.  "Mere doubts or disagreement about the wisdom of a prior decision of this or a lower court will not suffice for this exception.  To be clearly erroneous, a decision must strike us as more than just maybe or

_____

      [51] Alberti v. Klevenhagen, 46 F.3d 1347, 1351 n.1 (5th Cir. 1995)(internal quotation marks and citation omitted).

32

probably wrong; it must be dead wrong."[52]   Texas asserts that

Hopwood II is in fact "dead wrong," arguing that its rulings

directly conflict with several Supreme Court precedents.

The Hopwood II panel held that:

> the University of Texas School of Law may not
> use race as a factor in deciding which
> applicants to admit [1] in order to achieve a
> diverse student body, [2] to combat the
> perceived effects of a hostile environment at
> the law school, [3] to alleviate the law
> school's poor reputation in the minority
> community, or [4] to eliminate any present
> effects of past discrimination by actors other
> than the law school.[53]

Texas attacks Hopwood II's rejection of two of the enumerated

justifications as being clearly erroneous.  Texas first contends

that the University has a compelling interest in remedying the

present effects of past discrimination, both by the University

itself and by the Texas public education system as a whole.  Texas

then argues that the University has a compelling interest in

obtaining a diverse student body.  We shall analyze these two

contentions in turn.

a.   Remedying the Effects of Past Discrimination

The Supreme Court has conclusively established that the

government can, consistent with the Constitution, use racial

preferences under particular circumstances to remedy the present

---

[52] City Public Service Bd. v. General Elec. Co., 935 F.2d 78,
82 (5th Cir. 1991)(internal quotation marks and citation omitted).

[53]  78 F.3d at 962.

33

effects of past discrimination.[54]  But it has also placed several limitations on the use of racial preferences for remedial purposes. In Wygant, the Court ruled that the government cannot use racial preferences to remedy general, societal discrimination.[55]  In Croson, the Court ruled that a municipality cannot use racial preferences in the awarding of construction contracts to remedy discrimination in the construction industry as a whole.[56]

Despite having addressed the subject of remedial racial preferences in several opinions, though, the Supreme Court has yet to establish specific rules for determining precisely how "localized" past discrimination must be before a particular governmental entity (in this case, the Law School or even the University) can, consistent with the Constitution, use racial preferences to remedy the effects of prior discrimination.  The Hopwood II panel nevertheless stepped into this "rules vacuum" and developed fairly specific guidelines for determining when remedial racial preferences are justified.  The panel ruled that (1) the University cannot use racial preferences to remedy discrimination

---

[54] See, e.g., United States v. Paradise, 480 U.S. 149, 167 (1987) ("[t]he Government unquestionably has a compelling interest in remedying past and present discrimination by a state actor"); Regents of the University of California v. Bakke, 438 U.S. 265, 363 (1978).

[55] Wygant v. Jackson Bd. of Educ., 476 U.S. 267 (1986).

[56] City of Richmond v. J.A. Croson Co., 488 U.S. 469 (1989).

in <u>other</u> components of Texas's public education system,[57] and (2) the record evidence did not support the University's use of racial preferences to remedy the effects of its <u>own</u> past discrimination.[58]

In arguing that the rulings of <u>Hopwood II</u> are clearly erroneous within the meaning of the law of the case doctrine, Texas contends, as it did then, that the University should be allowed to take race into account as a means of remedying the effects of past discrimination in other components of Texas's public education system. Texas advances two arguments in support of this contention. First, it insists that <u>Hopwood II</u> conflicts with the Supreme Court's rejection in <u>Croson</u> of the "stark" notion that a governmental entity "must limit any race-based remedial efforts to eradicating the effects of its own prior discrimination."[59] Texas takes this statement out of context, however: The <u>Croson</u> court went on to explain that "if [a governmental entity] could show that it had essentially become a 'passive participant' in a [private] system of racial exclusion practiced by [local] elements...we think it clear that the [governmental entity] could take affirmative steps to dismantle such a system."[60] This holding is wholly inapplicable here because Texas has never claimed that the

---

[57] <u>Hopwood II</u>, 738 F.3d at 950.

[58] <u>Id.</u> at 952-55.

[59] <u>Croson</u>, 488 U.S. at 486.

[60] <u>Id</u>. at 492.

University was ever a passive participant in a _private_ system of racial exclusion.[61]  Thus, _Hopwood II_ does not conflict with the Supreme Court's decision in _Croson_.

Second, Texas argues that neither _Wygant_ nor _Croson_ commands the broad approach taken by the _Hopwood II_ panel.  This is certainly true:  _Hopwood II_ went beyond established Supreme Court precedent in several important respects.  Within the law of the case framework, however, it is not clear error for a court of appeals to tackle legal questions that the Supreme Court has declined to answer:  Lower courts are bound only by Supreme Court _holdings_ and not by the Court's election, either express or implied, to leave open particular legal questions.  This or other subsequent panels of our court may well disagree with the aggressive legal reasoning employed by the _Hopwood II_ panel,[62] but it cannot be said that, as a matter of law, the panel's decision is "dead wrong."  As _Hopwood II_'s ruling with respect to the appropriate scope of remedial racial preferences is not clearly erroneous within the intendment of the law of the case doctrine, we cannot today reconsider that decision with an eye toward disregarding or reversing it.

---

[61] Neither does the University contend that it was a "passive participant" in a _public_ system of racial exclusion; its sole _mea culpa_ is to having been an _active_ participant in a _public_ system of racial exclusion.

[62] _See_, _e.g._, _Hopwood II_, 78 F.3d at 962 (Wiener, J., specially concurring).

36

b.    Diversity as a Compelling Governmental Interest

Texas also contends that "[i]n holding that diversity may never be a compelling interest justifying the consideration of race or ethnicity in admissions, the Hopwood II panel attempted to create a new rule of constitutional law despite the Supreme Court's continued hesitation to do so."  Although we agree with Texas's characterization of the Hopwood II panel opinion, we have just demonstrated that a federal appeals court's creation of a new rule of constitutional law when a lacuna exists in the Supreme Court's rulings on the point does not constitute clear error.

The diversity rationale was first advanced by Justice Powell in his swing opinion in Bakke, in which he wrote only for himself.[63] Although four Justices joined Justice Powell in holding that "the State has a substantial interest that legitimately may be served by a properly devised admissions program involving the competitive consideration of race and ethnic origin,"[64] the same four disagreed with him as to the rationale that is necessary to justify constitutionally the government's use of racial preferences. Justice Brennan wrote separately on behalf of the four concurring Justices to express the view that the Constitution permits the government to use racial preferences only "to remedy disadvantages

---

[63] Bakke, 438 U.S. at 316-19 (Opinion of Powell, J.).

[64] Id. at 320.

37

cast on minorities by past racial prejudice."[65] None of the four other justices would go the extra step proposed by Justice Powell and approve student body diversity as a justification for a race-based admission criterion.

Although Bakke clearly stands for the proposition that the government can use racial preferences under some circumstances, no controlling rationale emerged from that opinion to delineate precisely what those justifying circumstances are. Thus, in deciding whether the system of racial preferences employed by the Law School was constitutional, the Hopwood II panel was free to determine which among the competing rationales offered by the justices in Bakke is constitutionally valid.[66] Once the Hopwood II

---

[65] Id. at 325.

[66] We respectfully disagree, then, with the Ninth Circuit's recent holding that Justice Powell's diversity rationale is binding Supreme Court precedent. See Smith v. University of Washington, Nos. 99-35209, 99-35347, 99-35348, 2000 WL 1770045, at *10 (9th Cir. Dec. 4, 2000). Despite the facts that (1) no Justice other than Justice Powell even discussed diversity in Bakke and (2) no other Justice joined that part of Justice Powell's opinion that advanced the diversity rationale, the Ninth Circuit nevertheless hypothesized that Justice Brennan (joined by Justices White, Marshall, and Blackmun) "would have embraced [the diversity rationale] if need be." See id. (emphasis added). It follows, at least according to the reasoning of the Ninth Circuit, that Justice Powell's diversity rationale is "the narrowest footing upon which a race-conscious decision making process could stand" and accordingly is the "holding" of Bakke under Marks v. United States 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case . . . the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds."). See id. at *10. With respect, however, we do not read Marks as an invitation from the Supreme Court to read its fragmented opinions like tea leaves, attempting to divine what the Justices "would have" held. Rather, in the absence of subsequent

38

panel determined to decide the case on the question of compelling state interest and not, as urged in the special concurrence, on the question of narrow tailoring,[67] the panel was constrained in its judgment only by other Supreme Court decisions and by the text of the Constitution itself.

The Hopwood II panel ruled that the Constitution does permit the government to use racial preferences for the purpose of remedying the present effects of past discrimination,[68] but that the government cannot constitutionally use racial preferences for the purpose of fostering student body diversity.  Although Justice Powell would surely have disagreed with that holding, we cannot say that Hopwood II conflicts with any portion of Bakke that is binding on this court.[69]  Some may think it was imprudent for the Hopwood

---

Supreme Court precedent squarely and unequivocally holding that diversity can never be a compelling state interest, we read Bakke as not foreclosing (but certainly not requiring) the acceptance by lower courts of diversity as a compelling state interest.

[67] Hopwood II, 78 F.3d at 966 (Wiener, J., specially concurring).

[68] Id. at 948-49 (citing Croson, 488 U.S. at 500).

[69] We recognize that in a recent challenge to the University of Michigan's use of race in admissions decisions, the district court held that Supreme Court precedent does not bar courts from considering diversity as a compelling state interest. See Gratz v. Bollinger, No. 97-CV-75231, 2000 WL 1827468, at *9 (E.D. Mich. Dec. 13, 2000).  Although decided contrary to Hopwood II with respect to the constitutional validity of the diversity rationale, Gratz is nevertheless consistent with our position that the Hopwood II panel was neither constrained to accept, nor required to reject, diversity as a compelling state interest under binding Supreme Court precedent.

<u>II</u> panel to venture into uncharted waters by declaring the diversity rationale invalid, but the panel's holding clearly does not conflict directly with controlling Supreme Court precedent. Inasmuch as the <u>Hopwood II</u> panel's ruling on diversity did not rise to the level of clear error, the law of the case doctrine bars our revisiting or disregarding that decision today.

2. <u>Hopwood B's Injunction</u>

  a. <u>Standard of Review</u>

We review the district court's grant of a permanent injunction for abuse of discretion.[70]

  b. <u>Injunction Against Consideration of Race</u>

On remand from <u>Hopwood II</u>, the district court entered an injunction forbidding the Law School and its administrators "from taking into consideration racial preferences in the selection of those individuals to be admitted as students."[71] Texas asks us to reverse that injunction, arguing that it conflicts with the Supreme Court's holding in <u>Bakke</u>.[72] In <u>Hopwood A</u>, the district court refused to enter an injunction against the University that would forbid the Law School's use of racial preferences in its admissions process. On appeal of that ruling, the <u>Hopwood II</u> panel stated:

---

[70] <u>Regions Bank of Louisiana v. Rivet</u>, 224 F.3d 483, 488 (5th Cir. 2000)(citing <u>Peaches Entertainment Corp. v. Entertainment Repertoire Assocs., Inc.</u>, 62 F.3d 690, 693 (5th Cir. 1995).

[71] <u>Hopwood B</u>, 999 F. Supp. at 923.

[72] 438 U.S. 265 (1978).

> It is not necessary, however, for us to order at this time that the law school be enjoined, as we are confident that the conscientious administration at the school, as well as its attorneys, will heed the directives contained in this opinion.  If an injunction should be needed in the future, the district court, in its discretion, can consider its parameters without our assistance.  Accordingly, we leave intact that court's refusal to enter an injunction.[73]

Despite (1) the district court's original refusal to enjoin the Law School and (2) the Hopwood II panel's admonition that it did not believe that an injunction was necessary, on remand the district court in Hopwood B entered an injunction barring the Law School "from taking into consideration racial preferences in the selection of those individuals to be admitted as students."  Given the Hopwood II panel's instructions on remand, the district court was certainly within its discretion to investigate the necessity of entering an injunction and to enter an appropriate injunction if it concluded that one was needed —— and apparently it did so.  The particular injunction entered by the district court, however, must be reversed for two reasons.

First, in its otherwise extensive and able management of this case on remand, one thing that the district court did not do was conduct a hearing to determine whether an injunction "was needed in the future."[74]  Neither did it purport to comply with Federal Rule

---

[73] Hopwood II, 78 F.3d at 958-59.

[74] Id.

41

of Civil Procedure 52(a), which requires federal trial courts to support their judgments with written findings of fact and conclusions of law. Nowhere to be found in the district court's lengthy and otherwise thorough opinion are any express findings of fact or conclusions of law addressing or supporting the need for an injunction; and we cannot glean any, even implicitly, from other parts of that opinion. We are left no choice, therefore, but to reverse the court's injunction for failure to comply with Rule 52(a). We deliberately elect to reverse rather than vacate the district court's injunction, however, so that we may remand and thereby give the court an opportunity to explicate its findings and conclusions if it should still perceive a need to issue an injunction.

In reversing and remanding, however, we would be remiss if we did not emphasize a second reason for so doing: On its face, the district court's injunction impermissibly conflicts with the square holding in Bakke. The Hopwood B injunction forbids the University from using racial preferences for any reason, despite Bakke's holding that racial preferences are constitutionally permissible in some circumstances.[75] Consistent with that position, Hopwood II does not bar the University from using race for any and all remedial purposes; rather Hopwood II bars the University from using race to remedy the effects of previous discrimination in other

---

[75] Bakke, 438 U.S. at 320.

42

components of Texas's public education system only.[76] By enjoining any and all use of racial preferences, the district court went beyond the holding of Hopwood II and, in the process, entered a judgment that conflicts with Bakke. If, on remand, the district court should determine, after conducting an evidentiary hearing or hearings, that an injunction is necessary, and supports that determination with findings of fact and conclusions of law, any injunction that it enters must not exceed the scope of the ruling in Hopwood II or the holding in Bakke.

C.   Attorneys' Fees

Both sides have expressed displeasure with the district court's rulings on attorneys' fees. Presumably their displeasure will continue, for we affirm the court's attorneys' fees rulings in all respects.

Congress has provided an incentive for attorneys to take on difficult civil rights cases by allowing district courts in their discretion to shift, from the plaintiffs to the defendants, the cost of prosecuting such an action.[77] Title 42, Section 1988(b) of the United States Code provides:

> In any action or proceeding to enforce a provision of .
> . . [section 1983] . . . the court, in its discretion,
> may allow the prevailing party, other than the United

---

[76] Hopwood II, 78 F.3d at 952.

[77]   See 42 U.S.C. § 1988(b); Riddell v. National Democratic Party, 624 F.2d 539, 543 (5th Cir. 1980) ("Congress enacted this statute in 1976 to encourage private attorneys general to enforce fundamental constitutional rights under section 1983.").

43

States, a reasonable attorney's fee as part of the costs[.][78]

### 1.  Standard of Review

The district courts' discretion in awarding attorneys' fees under § 1988 is appropriately broad.  We have repeatedly noted in the past, "'[w]hen a district court awards [attorneys' fee pursuant to 42 U.S.C. § 1988], we review the award only for an abuse of discretion. . . ."A request for attorney's fees should not result in a second major litigation.". . .We cannot overemphasize the concept that a district court has broad discretion in determining the amount of a fee award.'"[79]  Appellate courts have only a limited opportunity to appreciate the complexity of trying any given case and the level of professional skill needed to prosecute it.  In contrast, the district court here has, among other things, observed firsthand the presentation of testimony and argument at trial, sifted through countless depositions and interrogatories, and assessed the value of numerous dispositive filings.

### 2.  Texas's Contentions

---

[78]  42 U.S.C. § 1988(b).

[79]  Bell v. Schexnayder, 36 F.3d 447, 449 (5th Cir. 1994) (quoting Associated Builders & Contractors of Louisiana, Inc. v. Orleans Parish School Bd., 919 F.2d 374, 379 (5th Cir. 1990)(quoting Hensley v. Eckerhart, 461 U.S. 424, 437 (1983))). See also 1 Steven Alan Childress & Martha S. Davis, Federal Standards of Review § 4.15 (3d ed. 1999) ("The fee award [under § 1988] will not be reversed unless it constitutes an abuse of discretion, there is strong evidence that it is excessive or inadequate, or the amount chosen is clearly erroneous.").

44

Texas raises two objections to the district court's award of attorneys' fees: (1) The Plaintiffs are not prevailing parties within the meaning of 42 U.S.C. § 1988(b); and (2) Even if the Plaintiffs are deemed to be prevailing parties, they would not be entitled to any fees because they were unable to achieve any direct relief. The prevailing parties issue was resolved by the district court before the appeal in Hopwood II.[80] On completion of that appeal, we remanded with instructions for the district court to determine the reasonableness of the fees, not for the parties to relitigate the prevailing party issue.[81] In any event, the Plaintiffs are quite clearly prevailing parties as "[t]he plaintiffs accomplished the principal goal of the lawsuit — to dismantle all forms of racial preferences in public higher education in Texas."[82] The insistence of Texas that the Plaintiffs achieved only limited monetary relief is unavailing. Even nominal damages can support an award of attorneys' fees.[83] Attorneys' fees

---

[80] See Hopwood v. Texas, No. A 92-CA-563 (W.D. Tex. Nov. 14, 1994)(order denying motion for attorneys' fees)("There is no dispute the plaintiffs have met the minimum condition for prevailing party status by obtaining an enforceable judgment for one dollar in nominal damages.").

[81] See Hopwood v. Texas, No. 95-50062 (5th Cir. May 17, 1996)(order vacating judgment denying attorneys' fees and remanding with instructions that reasonable attorneys' fees should be granted).

[82] Hopwood B, 999 F. Supp. at 916.

[83] See Farrar v. Hobby, 506 U.S. 103, 112 (1992)(holding that a plaintiff in a civil rights action who wins an award of nominal damages is a prevailing party under § 1988 and therefore eligible

45

are particularly appropriate here, given the Law School's change of its admissions process as a direct result of the instant litigation.[84]

Texas contends, in the alternative, that the Plaintiffs are not entitled to any fee award because they achieved no specific injunctive or monetary relief. A prevailing plaintiff "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust."[85] As we discuss below, the district court properly accounted for the Plaintiffs' lack of success in obtaining monetary and other direct relief by reducing their attorneys' submitted hourly totals. We cannot credit Texas's argument that the Plaintiffs have not achieved a compensable goal. As noted, the Plaintiffs have achieved "the principal goal of their lawsuit" –– a benefit that inures to all future applicants to the Law School, at least those who advocate a race-blind system. It is important to add in this respect that Section 1988 "is a tool that ensures the vindication of important rights, even when large sums of money are not at stake, by making attorney's fees available

---

for attorneys' fees).

[84] See Robinson v. Kimbrough, 652 F.2d 458, 466 (5th Cir. 1981) (noting that fee awards are reasonable when plaintiff's lawsuit is "a substantial factor or a significant catalyst in motivating the defendants to end their unconstitutional behavior").

[85] Hensley v. Eckerhart, 461 U.S. 424, 429 (1983) (internal quotation marks and citations omitted).

46

under a private attorney general theory."[86]

### 3.   The Plaintiffs' Contentions

The Plaintiffs assert numerous objections to the district court's awards of attorneys' fees.  They first object to the court's refusal to consider fee requests for work done after the Supreme Court's refusal to grant their petition for a writ of certiorari.  The Plaintiffs filed their final supplemental fee applications before the trial on remand in Hopwood B.  Even if we were to conclude that the district court abused its discretion by entertaining the post-remand supplemental application before the trial rather than after it, such error would be harmless because the Plaintiffs are not prevailing parties on any issues resolved in the post-remand trial.  They were not able to prove entitlement to any monetary relief.  It is true that the court granted injunctive relief barring any use of racial preferences by the Law School, but to the extent the Plaintiffs prevailed on that issue, their victory was assured by professional services rendered prior to remand.[87]

The Plaintiffs also object to the district court's 25 percent summary reduction based on the inadequacy of the time entries, duplicative work product, and lack of billing judgment of their counsels' submitted hourly totals.  The district court did not

---

[86]  Farrar, 506 U.S. at 121 (O'Connor, J., concurring).

[87]  See Hopwood II,  78 F.3d at 962.

47

abuse its discretion in adjusting the number of hours downward.[88] In its opinion, the court lists and describes eleven different instances of lack of billing judgment by the Plaintiffs' counsel.[89] The Plaintiffs counter on appeal with an affidavit by one of the lead attorneys, insisting that he indeed did exercise billing judgment. Without more, however, the Plaintiffs cannot demonstrate that the district court abused its discretion.

The Plaintiffs further object to the district court's reduction of the submitted hourly totals to account for their lack of success. The Plaintiffs argue that they achieved the "principal goal of their lawsuit" by striking down racial preferences in higher education admissions in Texas. As Texas points out, however, the Plaintiffs did not receive any specific injunctive or monetary relief for their own asserted injuries, and they did not gain admission to the Law School. A fifteen per cent reduction for this lack of success is not an abuse of discretion.[90]

---

[88] See Walker v. U. S. Dep't of Housing & Urban Dev., 99 F.3d 761, 770 (5th Cir. 1996) ("The proper remedy when there is no evidence of billing judgment is to reduce the hours awarded by a percentage intended to substitute for the exercise of billing judgment.").

[89] See Hopwood B, 999 F. Supp. at 915-16 (describing, for example, how "thousands of dollars were spent repeatedly reading and reviewing the same Supreme Court cases on affirmative action" and that "compensation [was] sought for non-legal work such as reading a national best seller on affirmative action, attending a panel discussion regarding the impact of the case, and reviewing co-counsel agreements").

[90] See Albright v. Good Shepherd Hosp., 901 F.2d 438, 440 (5th Cir. 1990)(indicating that "those achieving limited or partial

The Plaintiffs next contend that in its analysis of the fee issue the district court ignored some of the factors listed in Johnson v. Georgia Highway Express, Inc.[91] to guide the district courts in their attorney's fee inquiries.[92] Specifically, the Plaintiffs argue that the district court either overlooked or failed to consider adequately the following Johnson factors: (1) the novelty and difficulty of the questions; (2) the skill required to perform the legal service properly; (3) the experience, reputation, and ability of the attorneys; (4) the amount involved and the results obtained; and (5) the "undesirability" of the case.[93] The district court did not abuse its discretion in according these factors little or no weight. The issues presented by this case may well provide grist for the political and legal mills, but they are "neither novel nor extraordinarily difficult[.]"[94] The underlying arguments about the place of affirmative action in the equal protection paradigm have been percolating since the Supreme Court's decision in Bakke if not longer[95]; only the evidence and analysis supporting each side have

---

success may recover only that which is reasonable in light of the relief obtained").

[91] 488 F.2d 714 (5th Cir. 1974).

[92] Id. at 717-19.

[93] Id.

[94] Hopwood B, 999 F. Supp. at 921.

[95] Bakke, 438 U.S. 265 (1978).

49

grown more sophisticated over the past two decades. Stated differently, this is not an issue that demanded a large amount of legal excavation in this instance. Additionally, as earlier noted, the Plaintiffs were indeed successful, but no amount of professional chest-pounding or puffery can obscure the fact that none of the Plaintiffs has been offered admission to the Law School or awarded monetary damages for the Law School's refusal or failure to offer them admission.

The district court's denial of fees for work of Plaintiffs' counsel in successfully opposing the attempted intervention by the Thurgood Marshall Legal Society, the Black Pre-Law Association, the NAACP Legal Defense Fund, and the Mexican-American Legal Defense and Educational Fund, is another bone of contention advanced by the Plaintiffs. In particular, they object to the extension of Independent Fed'n of Flight Attendants v. Zipes[96] to the facts of this case. The plaintiff in Zipes sought an award of attorney's fees from the intervenor. The Supreme Court held that recovery of fees from the intervenor cannot be had unless the intervention is "frivolous, unreasonable, or without foundation."[97] Our fellow circuits have extended this holding, in varying degrees, to the award of fees to prevailing plaintiffs from the pockets of losing defendants when the fees are based on interventions by third-

---

[96] 491 U.S. 754 (1989).

[97] Id. at 761.

50

parties.[98] We need not decide today whether a prevailing plaintiff is absolutely barred from shifting to the defendant the costs associated with defending against an intervention, for here the Plaintiffs did not "prevail" on this issue vis-à-vis Texas.[99] Texas remained neutral on the intervention issue. In addition, the potential intervenors made clear both to the trial court and to us in Hopwood I that the purpose of their intervention was to raise arguments and defenses that Texas itself had no interest in raising.[100] Both we and the trial court denied intervention, holding that Texas would adequately protect the interests of those affected by affirmative action.[101] It would be inequitable now for us to force Texas to pay for costs associated with a failed intervention which, in our determination, would have brought nothing more to the table than did Texas.[102] The Plaintiffs elected

---

[98] See, e.g., Rum Creek Coal Sales, Inc. v. Caperton, 31 F.3d 169, 176-78 (4th Cir. 1994); Bigby v. City of Chicago, 927 F.2d 1426, 1428-29 (7th Cir. 1991).

[99] Cf. Reeves v. Harrell, 791 F.2d 1481, 1483-84 (11th Cir. 1986).

[100] See Hopwood v. Texas, 1994 WL 242362, at *1; Hopwood I, 21 F.3d at 605.

[101] See id. at 606.

[102] See id. ("[The proposed intervenors] have not met their burden of demonstrating that they have a separate interest that the State will not adequately represent. The proposed intervenors have not demonstrated that the State will not strongly defend its affirmative action program. Nor have the proposed intervenors shown that they have a separate defense of the affirmative action plan that the State has failed to assert."); see also Hopwood II, 78 F.3d at 960 n.59.

51

to oppose intervention, and they were successful — but not against Texas:  They succeeded against the putative intervenors in a case instituted by Plaintiffs, not by Texas.  Neither logic nor equity supports taxing Texas under these circumstances.  The district court did not abuse its discretion in denying attorneys' fees to the Plaintiffs for their legal expenses incurred in opposing intervention.

The Plaintiffs' attorneys' fees objections also include the district court's denial of fees for monitoring the comments of Texas in the media and for responding to those comments.  The Plaintiffs argue that they are entitled to a fee award for this work because, for example, they were able to use one of the public comments by the Attorney General of Texas in their successful opposition to the granting of a writ of <u>certiorari</u> by the Supreme Court.  We are chary about granting requests for media fees.[103]  The controversy underlying this case is a politically and socially divisive one.  The district court's disallowance of fees for combat on the affirmative action issue in the non-legal media is not an abuse of discretion.

The Plaintiffs object additionally to the district court's reduction of their counsels' hourly rates.  For instance, Theodore Olson, a noted appellate litigator in our nation's capital and one

---

[103]  <u>See</u>, <u>e.g.</u>, <u>Watkins v. Fordice</u>, 7 F.3d 453, 458 (5th Cir. 1993); <u>Associated Builders & Contractors of Louisiana, Inc. v. Orleans Parish Sch. Bd.</u>, 919 F.2d 374, 380 (5th Cir. 1990).

of the lawyers for Plaintiffs Hopwood and Carvell, had his hourly rate reduced from $450.00 to $225.00. Although Mr. Olson advises that his rate was adjudged reasonable by the D.C. Circuit in an unrelated case, the attorneys' fees calculus is a fact-intensive one and its character varies from case to case. In this case, the district court found that in the relevant legal market, which is not the District of Columbia but Austin, Texas, high quality appellate representation could be obtained for a lower rate than that normally charged by Mr. Olson. Hourly rates are to be computed according to the prevailing market rates in the relevant legal market, not the rates that "lions at the bar may command."[104]

In essence, the Plaintiffs' argument is that the out-of-town rates should have been used because the out-of-towners had special competence and there was a lack of available counsel of that quality locally. The district court observed, however, that local counsel had "provided competent and skilled representation"[105] before the Plaintiffs obtained additional non-local counsel, and ventured the belief that local counsel would have been "capable of the same degree of competence regarding the appeal had it been determined he should have remained the plaintiffs' primary lawyer."[106] Contrary to the Plaintiffs' counsel's appreciation of

---

[104] Leroy v. City of Houston, 906 F.2d 1068, 1079 (5th Cir. 1990)(internal quotation marks and citation omitted).

[105] Hopwood B, 999 F. Supp. at 917.

[106] Id.

53

this case, we do not perceive it to have been extraordinarily difficult.  Again, the place of affirmative action in higher education has been the subject of legal discourse for many years. The district court's decision to reduce the hourly rates does not constitute an abuse of discretion.[107]

In sum, we find no abuse of discretion by the district court in its rulings on attorneys' fees.  We therefore affirm those rulings.

### III.
### CONCLUSION

The district court was correct, and thus free of clear error, in holding on remand that Texas had borne its burden of proving by a preponderance of the evidence that the Plaintiffs would have had no reasonable chance of being offered admission to the Law School

---

[107] Steven Smith, counsel to plaintiffs Elliott and Rogers, objects that his submitted rate was not adjusted for delay in payment.  This contention is unavailing.  The district court specifically indicated that it had reviewed the hourly rates for all the attorneys and adjusted them accordingly.  In many cases, when the attorneys submitted current hourly rates in addition to historical rates, the court used the current rates to compensate for delay in payment.  In Smith's case, the submitted rate of $125.00 was "higher than Smith's normal billing rate and is the highest rate Smith has ever received in any federal civil rights litigation he has undertaken."  See Hopwood B, 999 F. Supp. at 918. In light of the district court's finding that Smith had limited trial and appellate experience and a limited role in the case, and that the court found many of the requested rates to be excessive, we conclude that the lower court did not abuse its discretion in not increasing Smith's award for delay in payment.  We find that the higher rate that he received from the court —— higher than any other case he has tried —— takes into account delay in payment.  It is important to keep in mind that "attorneys' fee litigation should not require specific reasoning by the trial court to justify every facet of its decision[.]"  Blanchard v. Bergeron, 893 F.2d 87, 91 (5th Cir. 1990).

54

in 1992 under a constitutionally valid, race-blind admissions system. In affirming that ruling we avoid the need to address the district court's alternative findings of fact and conclusions of law regarding compensable damages incurred by the Plaintiffs.

The district court failed to comply with the strictures of Federal Rule of Civil Procedure 52(a), however, when it failed to provide findings of fact and conclusions of law to justify its injunction prohibiting absolutely the use of race as a factor in the admissions process. The district court also exceeded the limits of the remand under which it was operating and at the same time conflicted with the aspect of <u>Bakke</u> that authorizes consideration of race in higher education admissions to eradicate vestiges of previous discrimination. We therefore reverse the court's grant of that injunction and remand for further proceedings on the injunction issue consistent with this opinion.

As the district court acted within its discretion in all rulings on attorneys' fees, we affirm those rulings in all respects.

AFFIRMED in part; REVERSED and REMANDED in part.